**Lyle A. DeSPAIN and Mary R. DeSpain et al., etc., Plaintiffs-Appellants,**

**v.**

**DeKALB COUNTY COMMUNITY SCHOOL DISTRICT 428 et al., etc., Defendants-Appellees.**

No. 15836.

United States Court of Appeals Seventh Circuit.

July 26, 1967.

Certiorari Denied Jan. 22, 1968.

See 88 S.Ct. 815.

Schnackenberg, Circuit Judge, dissented.

Ralph Jonas, Chicago, Ill., Marks, Marks & Kaplan, Chicago, Ill., of counsel, for appellants.

Peter Fitzpatrick, Chicago, Ill., John A. Leifheit, DeKalb, Ill., for appellees.

Before SCHNACKENBERG, SWYGERT, and FAIRCHILD, Circuit Judges.

SWYGERT, Circuit Judge.

The plaintiffs, Lyle A. DeSpain and Mary R. DeSpain, are residents of De-

Kalb, Illinois. They are the parents of Laura I. DeSpain, who at the time the complaint was filed, was five years old and attended kindergarten class at the Ellwood Public School, located in De-Kalb County Community School District 428. The plaintiffs brought this action under 28 U.S.C. § 1343(3) to enjoin the officials of the school district from requiring the plaintiffs' child to recite a prayer during regular school hours. Besides the school district, individually named defendants include the members of the Board of Education and the superintendent of schools, the principal of the Ellwood Public School, and the kindergarten teacher, Esther Watne, who instructed Laura I. DeSpain.

Following a consolidated evidentiary hearing on the request for temporary and permanent injunctive relief, the district court dismissed the plaintiffs' complaint for failure to state a cause of action. DeSpain v. DeKalb County Community School Dist. 428, 255 F.Supp. 655 (N.D.Ill.1966). The court ruled that a verse which Mrs. Watne, the kindergarten teacher, required the children in her class to recite prior to their morning snack is "not a prayer or religious activity within the meaning of the Constitution. * * *" The verse read:

We thank you for the flowers so sweet;

We thank you for the food we eat;

We thank you for the birds that sing;

We thank you for everything.

We are of the view that the verse is a prayer and that its compulsory recitation by kindergarten students in a public school comes within the proscription of the first amendment, as interpreted by the Supreme Court in the "school prayer" cases. School Dist. of Abington Tp., Pa. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Accordingly, we reverse.

The evidence showed that for several years prior to the 1965–66 school year Mrs. Watne required the children in her kindergarten class to recite a verse identical to the above-quoted verse except that the last line read, "We thank you, God, for everything." In 1964 Mrs. Watne deleted the word "God," after the plaintiffs complained to Mrs. Watne, the superintendent of schools, the principal, and the Board of Education that the DeSpains' eldest son, then a kindergarten student, was required to recite the verse.

Mrs. DeSpain, who visited the kindergarten class on two occasions, and her daughter testified that immediately before and during the recitation of the verse in question the children folded their hands in their laps and closed their eyes. They also testified that at the conclusion of the verse many children said "Amen." The DeSpains' son testified that during the prior year the conduct of the children during the recitation of the verse was the same. On the other hand, several mothers of other children and Mrs. Watne testified that they did not see the children in a reverential attitude, nor did they hear any of the children say "Amen" after the recitation of the verse.[1]

Dr. A. Donald Davies, an Episcopal priest employed at Seabury Western Theological Seminary, Evanston, Illinois as a professor of Christian Education and Director of the Master of Arts program in Christian Education, testified that a prayer practically identical to the verse recited in Mrs. Watne's class, with the word "God" included in the last line, is found in a manual entitled "God's Love and Care," published by the National Department of Christian Education of the Episcopal church for the training of kindergarten teachers. Dr. Davies further testified that in his opinion the verse at issue is a prayer regardless of the fact that the word "God" was deleted from the last line, that "the intent is

---

1. The conflicts in the evidence relating to the conduct of the children during the recitation of the verse were resolved in the defendants' favor by the district judge. We believe that the attitude of the children during recitation is immaterial to a determination of the ultimate question which we must decide: Was the required recitation of the verse a proscribed public school activity?

to offer thanks to God." In response to a question by the district judge, Dr. Davies stated that if the verse were completely isolated he would not consider it a prayer, but that he would still wonder "what the 'you' was."

Dr. John Burkhart, a Presbyterian minister and a professor of Systematic Theology at McCormick Theological Seminary in Chicago and Curriculum Consultant for the Presbyterian Board of Christian Education, testified that the verse in question is a prayer in "form and intention." He said that "the 'you' which is the functional word in this prayer would be obviously addressed to someone who is thought to provide everything," and that "this is a common definition of God." He added, "It does not stop being a prayer when the word 'God' is removed, since the children who use it as a prayer, other than where it might have been used in the schools, use it and understand it as a prayer. So, in common context it is a prayer which has simply been modified, but has not lost its prayer connotation or meaning."

Mrs. Watne testified that she used the verse in question as part of her program of good citizenship and her "thankfulness" program. She said its purpose is "for appreciation, gratitude, for the whole world that is in front of them [the children]." She added that the verse was used to teach "social manners," and to thank the "helpers who came to our house * * * [to] help us do things * * * like TV repairmen, the plumber, the milkman. * * *" She admitted, however, that the use, purpose, and effect of the verse in question and the verse which contained the word "God" in the last line, were the same. She also said that in her mind the word "you" referred to God and that the verse was used by her to give thanks to a divine being for the wonders of nature, thanks which she hoped to impart to her pupils. She added, "Why shouldn't I tell them to thank Him?"

The superintendent of schools testified that he had heard the poem in question recited "hundred of times" and had "never yet felt that it had any religious connotation to it." He added that "when 'God' is used in the public school * * * it is a neutral kind of thing. There is no kind of theological interpretation of it, except the kind that the individual brings himself to that particular event." He admitted, however, that it would be improper if a plain, ordinary nondenominational prayer is said without comment in the public school by a teacher, and the children are instructed to recite it.

Finally, Edra Lipscomb, a professor in the Education Department at Northern Illinois University, testified that "verses of this kind are commonly used," and that in her opinion "this 'thank you' verse would certainly fit part of this philosophy of helping the children not [only] prepare themselves for life but actually become a part of the living society. * * *" She admitted, however, that according to her information the use of a very similar verse by kindergarten teachers in the Laboratory School at Northern Illinois University was prohibited in 1964.

The district judge decided that "the verse, recited in the setting proved by the testimony in this case, is not a prayer or religious activity within the meaning of the Constitution," because, among other reasons, "[t]he aim of inculcating good manners in the children, the mode of proper serving of a meal, and awaiting eating until all were served, and thanking donors of special treats, were paramount in the teacher's purposes." 255 F.Supp. at 656–657. The judge made the further statement:

[T]his is a case *de minimis*. Despite the theologians' characterization of this verse as a prayer, the court believes that set in the framework of the whole school day, its purpose was not to pray but to instill in the children an appreciation of and gratefulness for the world about them—the birds, the flowers, the food, and everything. They asked no blessing; they sought no divine assistance. Id. at 664.

■ Both in School Dist. of Abington Tp., Pa. v. Schempp, supra, and in Engel v. Vitale, supra, the Supreme Court admonished the state to observe strict neutrality with respect to religion in public schools. Mr. Justice Clark, speaking for the Court in *Schempp,* referred to the fact that the Supreme Court has consistently held that the establishment clause in the first amendment withdrew all legislative power respecting religious belief or the expression thereof. He then stated the test:

> [W]hat are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. 374 U.S. at 222, 83 S.Ct. at 1571.

Mr. Justice Black, speaking for the Court in the earlier *Engel* case, reviewed the historical purposes underlying the establishment clause. There he wrote:

> When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain. But the purposes underlying the Establishment Clause go much further than that. Its first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion. The history of governmentally established religion, both in England and in this country, showed that whenever government had allied itself with one particular form of religion, the inevitable result had been that it had incurred the hatred, disrespect and even contempt of those who held contrary beliefs. 370 U.S. at 431, 82 S.Ct. at 1267.

Neither the *Engel* nor the *Schempp* decision was an attack upon Christianity, religion, or prayer; those cases merely articulated within factual contexts the principles of the first amendment, which was designed to provide a bulwark against those who wish to impose their religious beliefs upon others through governmental action. Thus Mr. Justice Black continued in *Engel:*

> It is neither sacrilegious nor anti-religious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance. Id. at 435, 82 S.Ct. at 1269.

■ With these Supreme Court pronouncements in mind, an application of the test laid down by Mr. Justice Clark in *Schempp* to the facts of this case convinces us that the so-called "secular purposes" of the verse were merely adjunctive and supplemental to its basic and primary purpose, which was the religious act of praising and thanking the Deity.

It is not to be gainsaid that the verse may have commendable virtues in teaching kindergarten children "good manners" and "gratitude," to use Mrs. Watne's words. The fact, however, that children through the use of required schoolroom prayer are likely to become more grateful for the things they receive or that they may become better citizens does not justify the use of compulsory prayer in our public school systems. As the plaintiffs point out, if prayers which tend to teach and inculcate these virtues are not within the ambit of the bar imposed by the first amendment against such religious activity, any religious activity of whatever nature could be justified by public officials on the basis that the activity has beneficial secular purposes; as a result the Supreme Court's admonitions in *Engel* and *Schempp* would become meaningless.

The Second Circuit in Stein v. Oshinsky, 348 F.2d 999 (2d Cir.), cert. denied, 382 U.S. 957, 86 S.Ct. 435, 15 L.Ed.2d 361 (1965), was presented with a problem similar to the one with which we are

faced. In that case a principal of a New York City school ordered the kindergarten teachers, in the language of the complaint, "to stop the infant children from reciting the simple and ancient prayer: 'Thank You for the World so Sweet, Thank You for the Food We Eat, Thank You for the Birds that Sing—Thank You, God, for Everything.'" The plaintiffs, parents of children attending the school, demanded that the school officials give their children an opportunity to recite voluntary prayers in the classroom. When the school officials ignored the demand, suit was instituted in the federal court to force them to grant it. The district court granted the requested relief. The court of appeals reversed the decision, holding that neither the free exercise clause nor the guarantee of freedom of speech of the first amendment requires a state to permit students to engage in public prayer in state-owned facilities "whenever and wherever they desire." In the course of its opinion, the court stated:

> Determination of what is to go on in public schools is primarily for the school authorities. Against the desire of these parents that their children "be given an opportunity to acknowledge their dependence and love to Almighty God through a prayer each day in their respective classrooms," the authorities were entitled to weigh the likely desire of other parents not to have their children present at such prayers, either because the prayers were too religious or not religious enough; and the wisdom of having public educational institutions stick to education and keep out of religion, with all the bickering that intrusion into the latter is likely to produce. The authorities acted well within their powers in concluding that plaintiffs must content themselves with having their children say these prayers before nine or after three. Id. at 1002.

It will be noted that the verse with which the Second Circuit was concerned and the verse at issue here are identical except that in *Oshinsky* the last line contained the word "God." We think this is a distinction without a difference in view of the testimony of Mrs. Watne and the theologians who appeared as witnesses.

The district court characterized this case as *de minimis*. We are tempted to agree. Certainly, this verse was as innocuous as could be insofar as constituting an imposition of religious tenets upon nonbelievers. The plaintiffs have forced the constitutional issue to its outer limits. We are reminded, however, of what the Supreme Court said in *Schempp:*

> [I]t is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. The breach of neutrality that is today a trickling stream may all too soon become a raging torrent. * * * 374 U.S. at 225, 83 S.Ct. at 1573.

With respect to this facet of the case we also have in mind what the Court said in Everson v. Board of Education, 330 U.S. 1, 18, 67 S.Ct. 504, 91 L.Ed. 711 (1947): "The First Amendment has erected a wall between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach."

The judgment of the district court is reversed.

SCHNACKENBERG, Circuit Judge, (dissenting).

A witness for plaintiffs, Reverend A. Donald Davies, an Episcopalian priest, testified that he was familiar with the curricular content of manuals used in kindergartens, and that in all of them which he had seen there is some verse "like this"[1] in which the child expresses that he has received all of the things mentioned, by saying "thank you" for them. Reverend Davies insisted, however, that the verse in question with

---

1. We thank you for the flowers so sweet;
   We thank you for the food we eat;
   We thank you for the birds that sing;
   We thank you for everything.

"God" removed "is still a prayer". But he admitted that, with the word "God" left out, "They might regard that, then, as an expression of gratitude to the community of animate and inanimate and human things in which they live."

A witness for defendants was Edra Lipscomb,[2] a kindergarten teacher for 19 years, and now a professor at Northern Illinois University, teaching kindergarten courses. According to her testimony, the curriculum followed at the school here involved is typical of kindergarten curriculums now in use, as embodied in a comprehensive compilation thereof introduced in evidence. As to the particular verse under attack in this case, Mrs. Lipscomb testified that verses of this kind are commonly used, and they are not regarded as prayer exercises. She also swore that in a kindergarten workshop in 1964, where she had 40 kindergarten teachers participating, she ascertained that all of those present used such a verse, the purpose of which

> "is to help the youngsters become a part of the world around them, and so they do a lot of things in the kindergarten as a part of introduction into society, into the culture, and this 'thank you' verse would certainly fit part of this philosophy of helping the children not prepare themselves for life but actually become a part of the living society, contributing society. Also it is used to establish a quiet atmosphere in preparation for food."

Thus the record of the district court reveals that the daily kindergarten schedule, which was used at the school in question, provides for the children to recite:

> Every morning when the sun comes smiling up on everyone
> It's lots of fun to say good morning to the sun.
>
> Good morning, Sun.

1. We would not be justified in disturbing the findings of fact of the district court; in fact, we are not asked to do so. Certainly we should not rationalize (as do plaintiffs) that the elimination of the word "God" from a verse tends to prove that what remains is a prayer. The verse which remained to be recited by the pupils, after they were served cookies and milk, undoubtedly reflects in their young minds the pleasant prospect of eating. Naturally the recitation of the verse was a vocal expression of their gratitude. Moreover, this court has no right to take on a burden (which plaintiffs have voluntarily assumed) of establishing that a benefactor, to whom each child feels he is speaking, is a deity.

Human lives are replete with incidents where happy or wondrous events evoke voluntary, deep-seated emotions from those who witness them or participate therein. For instance, people may look at a glowing sunset and in admiration exclaim "Thanks for the opportunity of seeing that!" While one who overhears the exclamation might wonder why the remark was made, the fact remains that it is not a prayer. The expression of thanks evinces a sense of gratitude. And gratitude is a virtue, whether evoked by the marvels of nature or by the unidentified suppliers of tasty cookies and milk to kindergarten pupils. The enraptured viewer of the sunset, as well as each eager, usually hungry, child, gives expression to his gratitude.

Despite the elimination of the word "God" from the children's recital of thanks, plaintiffs maintain, in effect, that that word is still there in the minds of the children. Thus we are asked as a court to prohibit, not only what these children are saying, but also what plaintiffs *think* the children are *thinking*. Certainly thought is a matter varying with each child, be he Christian, Jew, atheist or agnostic. One who seeks to convert a child's supposed thought into a violation of the constitution of the United States is placing a meaning on that historic doctrine which would have surprised the founding fathers.

2. She was educated at the University of Illinois, Southern Illinois University, University of Michigan and Indiana University.

2. There was a conflict in the evidence at the trial in the district court on several issues of fact, (1) as to whether the children took a "devotional attitude" in reciting the verse in question, (2) whether some children said "amen" and "crossed themselves" and (3) whether the children's heads were bowed or they looked either at each other, at the teacher, or at the food. The court found as to these matters that it was "not convinced" that such devotional acts actually occurred. This is a finding of fact which is not clearly contrary to the manifest weight of the evidence and this court has no right, under 28 U.S.C.A. rule 52(a), to make a contrary finding.

3. The district court concluded that this is a case "de minimis". The court supported its conclusion by saying:

"* * * Despite the theologians' characterization of this verse as a prayer, the court believes that set in the framework of the whole school day, its purpose was not to pray but to instill in the children an appreciation of and gratefulness for the world about them—the birds, the flowers, the food, and everything. They asked no blessing; they sought divine assistance.

"The teacher was exercising her pedagogical function of making the pupils socially acceptable persons, as well-mannered guests, grateful in their appreciation of their provider. * * *

* * * * * *

"The court believes that this case presents the situation characterized by Justice Goldberg in the Schempp case,[2] supra, at 308, thus:

'It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow.'

[2] School Dist. of Abington Tp., Pa. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), Justice Goldberg's concurring opinion."

I agree that this is a case *de minimis*. I would affirm.